OPINION
{¶ 1} John McCallister appeals from his conviction in the Montgomery County Common Pleas Court of one count of aggravated robbery, one count of aggravated burglary, and one count of abduction. The burglary and robbery charges carried firearm specifications. McCallister waived a jury and the trial court judge found him guilty of all charges and specifications.
 {¶ 2} The facts underlying this appeal are not in dispute except whether McCallister wielded a fake gun or a real gun in committing the offenses charged. The facts are as follows:
 {¶ 3} On December 12, 2005, Patricia Stoner resided at 5424 Barnard Drive, Huber Heights, Ohio with her ex-husband Joe Watkins and her son Bryan Watkins. (Tr. 14). On that day between 11:00 p.m. and 12:00 a.m., Ms. Stoner was in her living room watching her four-year-old grandson Lucas. (Tr. 17-19). Her son Bryan was in his room with his girlfriend Vickie. (Tr. 18). Ms. Stoner heard a big bang and two men ran into her living room yelling, "Get on the floor. This is the police." (Tr. 19). The men were not wearing police uniforms and had scarves over their faces. (Tr. 19). One of the men had a silver semiautomatic gun in his hand and the other was armed with a metal ball bat. (Tr. 19-21). The man with the ball bat went into her ex-husband's bedroom. (Tr. 23).
 {¶ 4} The gunman came after Ms. Stoner, grabbed her by the hair and told her to get up. (Tr. 21-22). She testified the gunman was holding a silver semiautomatic gun. (T. 21). He put the gun to her head and told her he wanted her money. (Tr. 22). She testified she could feel the gun against her head and she said that "it was hard metal pushing against my head." (Tr. 22). Ms. Stoner told him she did not have any money. (Tr. 22). The gunman then stated, "let's see who else is in this house." (Tr. 22). The gunman wanted to know where Bryan was. (Tr. 23). The gunman dragged her down the hall and slammed her into the wall. (Tr. 23). When they got to Bryan's room the gunman pushed her into the room. (Tr. 24). After the gunman pushed her into Bryan's room he stood in front of Bryan with the gun to her head, and told Bryan he would "blow her away if Bryan didn't give him his money." (Tr. 25). When Bryan did not respond the gunman put the gun under Bryan's chin and told Bryan to give him his money. (Tr. 25). Bryan then handed over the money. (Tr. 25). The gunman took the money, yelled to his accomplice, and the two ran from the residence. (Tr. 25-26).
 {¶ 5} Seventeen days after the incident, Detective Michael Noll arrested Appellant and he admitted to Noll that he committed the crimes with his younger brother, Joshua. Appellant stated the gun he wielded was a fake gun and his brother used a ball bat.
 {¶ 6} In his defense, McCallister presented the testimony of Stacy Keefer who was Appellant's brother's girlfriend. She testified she saw the Appellant the day after the crimes were committed and she saw him holding a silver and black gun mostly made of plastic. (Tr. 93).
 {¶ 7} The Appellant's seventeen-year-old brother, Josh McCallister, admitted he wielded the baseball bat during the offenses against Patricia Stoner. At the time of the trial, Josh was serving a one-year commitment at the Department of Youth Services for his role in the offenses. Josh testified that the Appellant entered Ms. Stoner's home carrying a fake gun. He described the "fake gun" as follows:
 "Q Okay. Can you describe what color it was?
 "A I believe it was black or a dark gray, one of the two. I know it had — front of the barrel was kind of busted where you could see the — if you cocked the top back, you could see the — there where the pellets shoot out was busted. It was colored in with permanent black marker. And you could see some of the permanent black marker fading off and see that yellow or orange ring on the tip.
 "Q Did you ever hold the gun?
 "A Yes, sir, I did.
 "Q About how heavy was it?
 "A Without — the clip was metal. Without the clip in it, it was light. But if the clip was in it, it was little — a little heavier, but it wasn't same weight as a real pistol.
 "Q Was the clip in it? "A Yes, it was, sir.
 "Q Throughout that evening?
 "A Yes, sir, it was." (T. 11).
 "* * *
 "THE COURT: Okay. And you held it for the first time this night.
 "THE WITNESS: Yes.
 "THE COURT: Okay. And it had metal.
 "THE WITNESS: No.
 "THE COURT:-and it had some plastic. Was that right?
 "THE WITNESS: I believe that the clip was metal.
 "THE COURT: Okay.
 "THE WITNESS: Everything else that I seen was plastic. Heaviest part of the gun was the clip.
 "THE COURT: Do you know the difference between a semiautomatic and a revolver?
 "THE WITNESS: Yes, sir, I do.
 "THE COURT: What style gun was this gun that you're speaking about?
 "THE WITNESS: It looked kind of like a 45.
 "THE COURT: Okay. Semiautomatic type gun?
 "THE WITNESS: Yes, sir.
 "THE COURT: Not the revolver with a barrel.
 "THE WITNESS: No.
 "THE COURT:-that held the bullets?
 "THE WITNESS: No, sir.
 "THE COURT: Not like that.
 "THE WITNESS: No, it wasn't a revolver.
 "THE COURT: Okay. And how big was it?
 "THE WITNESS: About that big (indicating).
 "THE COURT: Seven or 8 inches long counting the barrel? Is that what you're saying?
 "THE WITNESS: Something like that. And it said P99. A real pistol is P89.
 "THE COURT: Okay. This had the P99 stamped on it somewhere?
 "THE WITNESS: Yeah. And then it has the company that made it or whatever on the other side.
 "THE COURT: Where is that letter and number stamped on it? Is that on the handle somewhere?
 "THE WITNESS: No. It's right on the top where it cocks back, like a 45.
 "THE COURT: Okay. Now, this thing that you're talking about on top of the gun where you've said `cut back,' is that the action where the gun fires? There's movement of that piece on top?
 "THE WITNESS: There's just movement of it. It just cocks back like a real 45, but, I mean-
 "THE COURT: Okay. So this gun cocks back?
 "THE WITNESS: Yes, sir.
 "THE COURT: And then does the trigger work?
 "THE WITNESS: No. Sir.
 "THE COURT: Can you make it go uncocked-
 "THE WITNESS: When you cock it back, you can pull the trigger and it's just like the hammer just slams forward, but there's nothing that you can shoot out of it.
 "THE COURT: There's a click of some sort.
 "THE WITNESS: Yeah, just — when you cock it back, it stays there. And you pull the trigger, and it just releases. It's not like, you know . . .
 "THE COURT: In your presence, did your brother John ever pull the trigger and have that clicking sound happen?
 "THE WITNESS: No, sir, he didn't.
 "THE COURT: Okay.
 "THE WITNESS: `cause the gun was kind of messed up where like if you try to pull it back, it won't stay, you know, and he didn't want to — them to see the — I mean, it was, for one, a fake gun, `cause if you pulled it back, you could see where the front was kind of broken and that had permanent marker with a black ring going out — or orange ring.
 "THE COURT: Okay. All right. Let's go back to the State. Any further direct (sic)?
 "RECROSS-EXAMINATION "BY MS. HEAPY: "Q Joshua, you never told the detective the person's name from whom you got the gun from, did you?
 "A Not that I can remember, no. No, ma'am.
 "Q And all this additional information you're giving the judge today about the markings, about how the top pulled back, you never gave any of that information to the detectives, did you?
 "A Yes, I did, ma'am. The detective that was sitting in with you yesterday, I told him that.
 "Q It's not in your written statement, is it?
 "A He didn't tell me to describe the gun, ma'am. But I did describe it to him in the interrogation room that I was there for three hours.
 "Q Now, you were talking about how — you wouldn't want to pull that top back." (Tr. 121-124).
 {¶ 8} Appellant testified on his own behalf and admitted to being the gunman during the home invasion. (Tr. 139, 145). McCallister admitted that his brother Josh McCallister was also involved in these offenses. (Tr. 176). Appellant testified that he was armed with a fake 45-caliber gun. (Tr. 145). He gave a detailed description of the gun that was similar to Josh's testimony regarding the description of the gun. (Tr. 146-147). He admitted that he grabbed Ms. Stoner by her hair and pulled her up. (Tr. 147, 165). He also admitted that he put the gun to her head, but denied dragging Ms. Stoner down the hall or throwing her around. (Tr. 148). He testified that Bryan Watkins gave him the money after he let go of Ms. Stoner. (Tr. 148). He denied telling Bryan that he would "blow her [Ms. Stoner] away if Bryan didn't give him his money." He admitted that once they got to Bryan's bedroom, he demanded money from Bryan and when Bryan hesitated he pointed the gun at Bryan in his face. He testified that after Bryan handed over the money he yelled to his brother and the two ran from the residence (Tr. 170).
 {¶ 9} Appellant admitted that after he was arrested he at first told Detective Noll that he was not involved in the home invasion. He said he then told Noll that he was involved in the home invasion, but he went in alone and he was armed with a fake gun. He testified he never implicated his brother Josh McCallister in the offenses. (Tr. 155).
 {¶ 10} In rebuttal, Detective Jeffrey Colvin testified he interviewed Josh McCallister and he testified Josh did not tell him that the gun was stamped "P99" or that there was a toy company's name written on the gun. (Tr. 184). Colvin did testify that Josh told him the gun his brother used was fake. (Tr. 190).
 {¶ 11} In a single assignment of error, the Appellant contends his firearm convictions are not supported by the manifest weight of the evidence.
 {¶ 12} McCallister was charged with firearm specifications under R.C.2941.145(A), which requires that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." The term "firearm" is defined in R.C. 2923.11(B) as follows:
 {¶ 13} "(1) `Firearm' means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. `Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.
 {¶ 14} "(2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actionsof the individual exercising control over the firearm." (Emphasis added).
 {¶ 15} The trier of fact may consider "the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." State v. Murphy (1990), 49 Ohio St.3d 206, 209,551 N.E.2d 932. In Murphy, the brandishing of a gun and an express threat to shoot and kill the victim if he did not give the defendant all the money was deemed sufficient to permit the jury to infer that the object used in the robbery was an operable firearm, since the offender had represented, by virtue of the threat, that the object used was an operable firearm, capable of expelling a projectile with lethal consequences. Id. at 207.
 {¶ 16} In Murphy, the defendant was charged with holding up the clerk at a United Dairy Farmers' store. The clerk and a customer testified the defendant brandished a one-or two-shot silver or chrome Derringer and told the clerk to give him the money or he would kill him. Justice Resnick wrote as follows in upholding Murphy's conviction:
 {¶ 17} "From the totality of the circumstances (i.e., the gun being wrapped in a shirt, a description of the instrument from eyewitnesses, and the statement by appellant that he would kill the clerk if he did not give him the money), the evidence is sufficient to establish proof beyond a reasonable doubt that the appellant in this case possessed a `firearm' as defined in R.C. 2923.11(B). We hold that before a defendant can receive an enhanced penalty pursuant to R.C. 2929.71(A), the state must present evidence beyond a reasonable doubt that the firearm was operable, or could readily have been rendered operable, at the time of the offense. However, such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime. To rule otherwise would destroy the intent of the General Assembly to impose an additional term of three years' actual imprisonment on those persons who use a firearm to carry out their criminal objective." Id. At 208-09.
 {¶ 18} The term "manifest weight of the evidence" `"concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'"State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541
(citation omitted). `"Weight is not a question of mathematics, but depends on its effect in inducing belief.'" Id. (citation omitted). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony." Id.
 {¶ 19} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. (citation omitted). A challenge to the weight of the evidence questions whether a greater amount of evidence was admitted to support the conviction than not. State v. Smith (1997), 80 Ohio St.3d 89, 113,684 N.E.2d 668. Regarding the issue of witness credibility, a reviewing court will not substitute its judgment for that of the trier of facts unless it is patently apparent that the fact finder lost its way.State v. Johnson, Montgomery App. No. 21335, 2006-Ohio-4935, at ¶ 26.
 {¶ 20} In this matter, Ms. Stoner testified that the Appellant was holding a silver semiautomatic gun. She said that when the Appellant put the gun to her head, she could feel "hard metal pushing against my head." (Tr. 22). The Appellant told Ms. Stoner's son he would "blow her away" if Bryan did not give him his money. (Tr. 25). From the totality of the circumstances, the trial court could reasonably conclude Appellant was wielding a firearm during the offenses charged. There is no evidence the trial court lost its way in arriving at the verdict. The assignment is Overruled.
 {¶ 21} The judgment of the trial court is Affirmed.
Wolff, P.J., and Grady, J., concur.