2007 VT 101

### State of Vermont v. Wendell M. Longley

[939 A.2d 1028]

No. 05-326

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed October 12, 2007

454

*John T. Lavoie*, Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant Wendell Longley appeals from his convictions, after a jury trial, for first degree aggravated domestic assault and reckless endangerment arising out of the same incident. Defendant argues: (1) the trial court erred when it failed to include in its jury instruction on reckless endangerment the requirements that a firearm must be loaded and operable; (2) the State was required, but failed, to prove that the firearm used in the domestic assault was operable; (3) the trial court erroneously

admitted highly prejudicial evidence of defendant's prior bad acts; and (4) the State impermissibly commented on defendant's failure to prove that the firearm was fake and his failure to deny this allegation to the police when they searched his property. We reverse defendant's conviction for reckless endangerment and affirm his conviction for first degree aggravated domestic assault.

¶ 2. The State presented the following evidence at trial. At the time of the incident at issue, defendant and complainant were married, but separated. Defendant lived in the marital home. In 2003, complainant obtained a relief from abuse order requiring defendant to remain 300 feet away from her. The order also required defendant to relinquish all of his firearms. In the fall of 2003, defendant asked his son to return a muzzle loader to him to use during the upcoming hunting season, and his son did so. In June 2004, complainant and a friend were walking by the marital home when complainant stopped to check on rose bushes she had planted prior to her separation from defendant. Defendant saw them, shouted insults at complainant, and told them to get off his property. As the women walked away, defendant shouted: "I'm going to get my muzzle loader and I'm going to shoot you between the eyes. . . . When it is over — when this is done, I'm going to hunt you down. I'll find you and I'll kill you."

¶ 3. The State's evidence further showed that defendant then drove after them, stopped his car in the street and pointed what the complainant recognized as defendant's hunting muzzle loader at them, and said: "I'm going to shoot you now, bitch. . . . Take a picture, my bitch, I'm going to shoot you." Complainant, who had taken to carrying a camera in the event defendant approached her in violation of the restraining order, took pictures of this encounter. She and her friend ran to a neighbor's house and the neighbor called the police. The neighbor testified that she saw the car stopped in the road and a person point a gun out the window at complainant and her friend. Interviewed several hours later by an investigating state police trooper, defendant acknowledged that he yelled at the women to get off his property, but denied having a gun and denied threatening complainant in any way. Two searches of defendant's residence, one with his consent and another pursuant to warrant, turned up no gun. Defendant was subsequently charged with first degree aggravated domestic assault for threatening to use a deadly weapon on his wife in violation of 13 V.S.A. § 1043(a)(2), and misdemeanor reckless

endangerment for placing her friend in danger of serious injury by pointing a rifle at her in violation of 13 V.S.A. § 1025. The muzzle loader was never found, although defendant's son testified that his father's rifle essentially looked and operated the same as the son's own muzzle-loading rifle, which was shown to the jury. Defendant was convicted of both charges and this appeal followed.

¶ 4. We hold: (1) the trial court insufficiently instructed the jury as to the crime of reckless endangerment; (2) first degree aggravated domestic assault does not require the use of an operable firearm; (3) the trial court did not abuse its discretion when it admitted evidence of defendant's past aggression toward complainant and the issuance of a citation to him for violating an abuse prevention order; and (4) the prosecutor's closing argument was fair comment on the evidence in this case and not a violation of defendant's Fifth Amendment rights.

## I. Requirements of a Firearm for Reckless Endangerment

¶ 5. On appeal we review jury instructions "as a whole and not piecemeal, in order to ensure that they accurately state the law on every theory fairly put forward by the evidence." *State v. Baird*, 2006 VT 86, ¶ 30, 180 Vt. 243, 908 A.2d 475 (quotations and citation omitted). The State concedes that the trial court's jury instructions were insufficient on reckless endangerment because they did not inform the jury that reckless endangerment requires proof that a firearm is operable. We first recognized operability as an element of reckless endangerment in *State v. McLaren*, when we held that the Legislature intended only to prevent people from placing others in "actual danger of death or serious bodily injury, not mere apparent danger." 135 Vt. 291, 293, 376 A.2d 34, 36 (1977), *superseded by statute as discussed in State v. Messier*, 2005 VT 98, ¶ 9, 178 Vt. 412, 885 A.2d 1193. Subsequent amendment of the reckless endangerment statute specifically eliminated another element required by *McLaren* — that the firearm be loaded — but did not address the operability requirement. *Messier*, 2005 VT 98, ¶¶ 7-10. Consequently, the operability requirement remains. *Id.* ¶ 10. Because the trial court failed to instruct the jury on this requirement, we reverse defendant's conviction for reckless endangerment.

## II. Firearm as a "Deadly Weapon" for First Degree Aggravated Domestic Assault

¶ 6. In its first degree aggravated domestic assault instructions, the trial court declined to instruct the jury that it needed to find that the rifle was loaded and operable at the time of its use. Instead, the court instructed the jury that it needed to find that defendant was armed with a "deadly weapon" which it defined, as set forth at 13 V.S.A. § 1021(3), as "any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury." Defendant objected to this charge, arguing that the instructions were erroneous because an inoperable or unloaded firearm is incapable of causing death or serious bodily injury, and thus cannot constitute a deadly weapon. Defendant contends that the State failed to offer any evidence of an operable and loaded weapon.

¶ 7. The State responds first by arguing that first degree aggravated domestic assault, unlike standard aggravated assault, focuses on the threat to the victim, not actual danger, and a firearm can be used to create fear or intimidation regardless of whether it is loaded or operable. The State further argues that even if proof of actual danger is required, there was sufficient evidence for the jury to conclude that defendant's rifle was capable of producing death or serious bodily injury. "Determination of the essential elements of an offense upon which the jury must be instructed is a matter of law and reviewed de novo." *State v. Coburn*, 2006 VT 31, ¶ 14, 179 Vt. 448, 898 A.2d 128.

¶ 8. First degree aggravated domestic assault occurs when a person "uses, attempts to use or is armed with a deadly weapon and threatens to use [it] on a family or household member." 13 V.S.A. § 1043(a)(2). As stated in the jury instructions, a "deadly weapon" is defined as "any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury." *Id.* § 1021(3). Looking at the plain language of the statute, there is no requirement that a firearm be loaded or operable to be a "deadly weapon." See *State v. Kimmick*, 2007 VT 45, ¶ 12, 181 Vt. 635, 928 A.2d 489 (mem.) (construing statute by first examining its plain

meaning). Though an unloaded or inoperable firearm is generally incapable, then and there, "of producing death or serious bodily injury," the statute does not require immediate dangerousness in fact. Instead, the statute focuses on the "use" of any object and whether such use is *"known* to be *capable* of producing death or serious bodily injury." *Id.* (emphasis added). Further, the statutory definition does not make the knowledge of the object's capacity for deadly harm dependent upon an actor's "intended" use alone; rather, an object's danger can be objectively "known" from the "manner" in which it is used. *Id.*

¶ 9. The New Hampshire Supreme Court reached a similar conclusion when interpreting a statutory definition of "deadly weapon" nearly identical to that found in 13 V.S.A. § 1021.[1] *State v. Hatt*, 740 A.2d 1037, 1038-39 (N.H. 1999). The court ruled that a firearm used in an assault need not be loaded and operable to be considered a deadly weapon, reasoning that "known to be capable," as used in the statutory definition means "generally recognized," which in turn means "objectively understood." *Id.* at 1038 (emphasis omitted). The description does not require operability because a firearm used in threatening to kill someone is objectively understood to be capable of causing serious bodily injury. *Id.* at 1038-39. In the present case, had our Legislature intended the definition of deadly weapon to include only firearms that are loaded and operable, it could have explicitly said so. Cf. *People v. Favalora*, 117 Cal. Rptr. 291, 292 (Ct. App. 1974) (interpreting statute banning sawed-off shotguns to not require operability; finding significance in the legislature's failure to explicitly include operability in the statute); see also *Wetterau, Inc. v. Dep't of Taxes*, 141 Vt. 324, 330, 449 A.2d 896, 899 (1982) (rejecting broad definition of a term when such meaning, if intended, could have been more simply accomplished).[2]

---

[1] The New Hampshire statute defined "deadly weapon" as "any firearm, knife or other substance or thing which, in the manner it is used, intended to be used, or threatened to be used, is known to be capable of producing death or serious bodily injury." N.H. Rev. Stat. Ann. § 625:11(V) (2007).

[2] Other courts have held to the contrary based on statutes that, unlike Vermont's, expressly require that a weapon be capable of deadly harm to be considered a "deadly weapon." See *People v. Wilson*, 684 N.Y.S.2d 718, 720-21 (App. Div. 1998) (noting that the legislature chose to define "deadly weapon" as a loaded weapon, a shot from which is capable of producing death or serious bodily injury); *State v. McCallister*, No. 21637, slip op., 2007-Ohio-576, ¶¶ 12-17 (Ct. App. Feb. 9, 2007)

¶ 10. To construe this language otherwise — to define the crime solely according to an accused's intent to actually injure another with a firearm rather than an intent to put another in fear of a gunshot — would make the statute virtually unenforceable absent a confession or recovery of the firearm. Equally absurd would be to base enforcement conditioned upon proof of the accused's private knowledge that a firearm is ready and able to fire, again dependent upon admission or, possibly, recovery of the weapon, rather than the victim's objective perception of danger based on a general knowledge that firearms are ordinarily capable of inflicting death or serious injury. Because "[a] presumption obtains against a construction that would lead to absurd results," *Craw v. Dist. Court*, 150 Vt. 114, 119, 549 A.2d 1065, 1069 (1988), we hold that the State need not prove that a firearm is actually loaded or operable to constitute a "deadly weapon" for purposes of the first degree aggravated domestic assault statute.

¶ 11. In summary, the statutory language and logic leads to the conclusion that a firearm employed in a threat against a family or household member need not be shown to be operable or loaded to constitute a deadly weapon. First, the wording of the definition of deadly weapon is broadly written to include anything that is, in the manner used, "known to be capable" of producing harm. Second, several of the assault statutes to which the definition applies, most notably the charged crime, proscribe conduct beyond placing someone in actual danger. These crimes are in contrast to reckless endangerment, which requires that a firearm be operable because placing a person in actual danger is an element of the crime. *Messier*, 2005 VT 98, ¶ 10. In the context of first degree aggravated domestic assault, it is entirely irrelevant if a rifle brandished to punctuate a threat was loaded and able to fire when the threat was made, because this crime does not require an imminent threat. Consequently, a firearm need not be proven to be loaded and operable, immediately or otherwise, to constitute a deadly weapon under 13 V.S.A. §§ 1021(3) and 1043(a)(2), and the court did not err by omitting such a requirement in its instructions to the jury.

---

(relying on the statutory definition of deadly weapon, the court determined that a firearm includes inoperable guns only if they can readily be made operable); *State v. Mustain*, 675 P.2d 494, 495-96 n.1 (Or. Ct. App. 1984) (holding that a firearm must be loaded and operable to be capable of inflicting serious bodily harm).

### III. Admission of Prior Bad Acts and Evidence of Motive

¶ 12. At trial, the State introduced evidence of defendant's prior bad acts and animus against complainant in the form of: (1) testimony about an extended assaultive episode in September 2003 that culminated in a death threat comparing complainant to deer heads mounted on the wall; (2) the relief-from-abuse order complainant obtained against defendant; and (3) defendant's citation for violating the order by following and insulting complainant. The trial judge admitted the evidence of the prior assault as evidence of context and ultimately admitted the evidence of the citation to show motive. Defendant argues that the introduction of his prior bad acts inhibited his ability to obtain a fair trial.

¶ 13. The State asserted that prior instances of abuse demonstrated defendant's motive and intent to threaten complainant, and that the citation could have prompted defendant to get even with complainant for reporting him to the police. Defendant countered that his intent and motive were not elements genuinely in issue and relevant under Vermont Rule of Evidence 404(b), because the case clearly fell under the reasoning announced in *State v. Lipka*, where we held that when a defendant claims he did not commit the alleged offense, he implicitly concedes that he acted with the requisite intent if the jury finds that he did in fact commit the acts charged. 174 Vt. 377, 392-93, 817 A.2d 27, 39-40 (2002).

¶ 14. We distinguish *Lipka* for three reasons. First, the prior bad acts admitted into evidence in that case were assaults against a different victim, rather than incidents concerning the same complaining witness as in the instant case. Second, *Lipka* did not address evidence of motive or a situational context which, as here, tends to satisfy the State's burden to prove, over defendant's denial, that the incident happened at all. See *State v. Forbes*, 161 Vt. 327, 331, 640 A.2d 13, 15 (1993) (allowing evidence of other bad acts as context tending to overcome defendant's categorical denial of any sexual abuse). Third, unlike *Lipka*, where the nature of the charged intentional act — sex with a child — was not "genuinely in issue," *Lipka*, 174 Vt. at 391, 817 A.2d at 39 (quotation omitted), the State had the burden in this case not only to prove that defendant intentionally threatened, but also that he did so using an actual deadly weapon. This aspect of the case was at issue throughout the trial by virtue of the repeated suggestions by the defense that the rifle was "fake," an "imitation," or a "replicate."

■ ¶ 15. Courts may admit evidence of a defendant's prior wrongs to show motive or intent, V.R.E. 404(b), as long as the probative value is not substantially outweighed by the danger of unfair prejudice. V.R.E. 403. Trial courts have broad discretion to admit evidence of a defendant's prior bad acts, and we will reverse such a decision only when we find an abuse of discretion resulting in prejudice. *State v. Ovitt*, 2005 VT 74, ¶ 8, 178 Vt. 605, 878 A.2d 314 (mem.). Furthermore, we will presume "the probative value of the evidence argued by the State." *Lipka*, 174 Vt. at 396, 817 A.2d at 43. Any evidence of prior wrongs, especially for those similar to the one currently at issue, creates a risk of prejudice, *id.* at 397, 817 A.2d at 43, but prejudice is unfair only when it substantially outweighs the probative value of the legitimate purpose for which the evidence is used. See, e.g., *State v. Desautels*, 2006 VT 84, ¶ 15, 180 Vt. 189, 908 A.2d 463 (applying V.R.E. 403, 404(b)).

■ ¶ 16. The legitimate evidentiary purposes of "other crimes, wrongs, or acts" listed in Rule 404(b) is not exhaustive, and the State may introduce such evidence for other probative reasons. *State v. Forbes*, 161 Vt. at 332, 640 A.2d at 16. The State asserts that it introduced evidence of defendant's prior abusive behavior for the legitimate purpose of revealing the context in which the most recent offense occurred. We acknowledged this as a legitimate use in a case of sexual assault of a daughter by her father in *Forbes*. In that case, we upheld the admission of evidence of the father's prior violence and sexual misconduct against his daughter because we found that allegations of a single instance of incestuous behavior "taken out of its situational context of secrecy, oppression, and recurrence, [was] likely to seem incongruous and incredible." *Id.* at 331, 640 A.2d at 15.

¶ 17. Prior bad act evidence was again recognized to show context, as well as intent, in *State v. Sanders*, 168 Vt. 60, 62-63, 716 A.2d 11, 13 (1998). Although *Sanders* involved a defendant's physical abuse of his live-in partner rather than the sexual abuse of a child, we upheld the admission of prior bad act evidence because it "portray[ed] the history surrounding the abusive relationship" and "provid[ed] the needed context for the behavior at issue." *Id.* at 62, 716 A.2d at 13. We reasoned that the State may introduce occasions of prior abuse to show that an assailant meant to threaten his victims. *Id.* We reiterated this reasoning in *State v. Hendricks*, a case involving a charge of second-offense domestic

assault against the defendant's girlfriend. 173 Vt. 132, 139-41, 787 A.2d 1270, 1276-77 (2001). There, we upheld the admission of evidence of prior abuse over the defendant's objections that the jury would punish him for bad character. We concluded that the State properly introduced two prior instances of abuse, not to prove defendant's propensity for abuse, but "to provide the jury with an understanding of [the] defendant's actions" in the context of the couple's underlying violent relationship and to prove an element of prior conviction, as well as to negate any impression of the incident as isolated and unlikely. *Id.* at 139, 787 A.2d at 1276 (quotation omitted). Finally, we have also noted that the need to provide context in domestic abuse cases is especially relevant when the pattern of abuse involves the same victim. See *State v. Winter*, 162 Vt. 388, 393, 648 A.2d 624, 627 (1994) (stating that context is important only when the offenses all involve the same victim).

¶ 18. Ordinarily, we will not find that a trial court abused its discretion to admit evidence of past wrongs unless it failed to weigh the evidence's probative value against its prejudicial effects. See *State v. Lawton*, 164 Vt. 179, 186, 667 A.2d 50, 57 (1995). Trial courts do not have to specify the exact weight they assign to each factor during a Rule 403 analysis. *State v. Shippee*, 2003 VT 106, ¶ 14, 176 Vt. 542, 839 A.2d 566 (mem.). Generally, the trial court's discretionary ruling will be upheld where there is "some indication — especially in cases like this one where the potential for unfair prejudice is high — that the court actually engaged in the balancing test and exercised its discretion under V.R.E. 403." *Id.* (emphasis omitted).

¶ 19. In the instant case, the trial court's inquiries during the evidentiary hearings and its cautionary instructions during the trial show that it did consider the probative value and the resulting prejudice from the State's various proffers of evidence. At a pretrial hearing held on October 12, 2004, the court expressed concern about the prejudicial effect of prior bad acts evidence generally, specifically that such evidence not be perceived by the jury as an "unwritten allegation . . . that he did it this time because he did it before." At a subsequent motion hearing held on October 28, the court pressed the State for reasons why evidence of prior bad acts should not be withheld until justified by the need to cross-examine defendant or to rebut the defense presentation. The State explained that, in addition to providing

context, defendant's prior assault, threats, and stalking of the complainant, and his declared belief that she was unfaithful, explained defendant's motivation, providing evidence of his intent to threaten his wife, and to put her in fear of death or serious bodily injury. The court concluded that the proffer fell within the rationale of admissibility under *Sanders* and *Hendricks*, cases where we upheld the introduction of a defendant's prior assaults against the same victim under Rules 404(b) and 403, despite prejudice, when the evidence proved an element of the offense as well as establishing a situational "context" for the otherwise isolated, and seemingly "incongruous and incredible," single allegation of abuse. *Hendricks*, 173 Vt. at 139-41, 787 A.2d at 1276-78; *Sanders*, 168 Vt. at 62, 716 A.2d at 13.

¶ 20. During the motion hearing held on October 28, the court also expressed concern about unfair prejudice resulting from the State's proposed introduction of the police citation for an alleged abuse-prevention-order violation issued to defendant the day before the rifle incident. The State proffered the citation as evidence of a potential motive for defendant's threats. The court projected that it would not admit the evidence without a more concrete relation to the alleged threatening behavior. On the first day of trial, the State augmented its proffer with complainant's anticipated testimony, based on her earlier reports to police, that defendant complained at the time of the threat that she had "turn[ed] [him] into the police again." After complainant did testify that defendant accused her of "trying to put [him] back in jail" while pointing the rifle at her and threatening to shoot, the court later permitted introduction of the citation over defendant's objection.

¶ 21. As it turned out, evidence of the citation was probative of motive and presented slight risk of undue prejudice. The nature of the citation, and even the underlying allegations for the citation — following complainant and insulting her — are substantially dissimilar to the death threat charged in the instant case. Cf. *Winter*, 162 Vt. at 399, 648 A.2d at 631 (recognizing that evidence of past unpunished crime is most prejudicial when similar to the charge at issue). The fact that defendant was cited for violating an abuse prevention order is not the kind of particularly "inflammatory" evidence requiring a high degree of probative value to justify its admission. See *State v. Catsam*, 148 Vt. 366, 382, 534 A.2d 184, 194-95 (1987) ("It is the incremental

probity of the evidence that is to be balanced against its potential for undue prejudice." (quotation omitted)). Indeed, this evidence was relatively dull compared to the fairly damning evidence already heard and seen by the jury that defendant stopped his car and pointed a rifle out the window at his wife and her friend and threatened to kill them both.

¶ 22. Also in dispute was whether defendant used a real firearm as a deadly weapon to threaten his wife and to place her friend in danger. Evidence of defendant's deep-seated animosity, anger, and motive against his wife was therefore important to the State's effort to establish an inference, from defendant's past actions, prior gun threats, and historic anger, that he was angry and serious enough to employ a real weapon in this assault. "Under the circumstances, the evidence of prior acts," and the fact and timing of the citation, "was highly probative" and its admission was no abuse of discretion. *Id.* at 383, 534 A.2d at 195. This is particularly true in light of the trial court's immediate jury instruction that the citation reflected an accusation only, to be considered in connection with the State's claim that defendant was motivated by anger, and was not evidence of any actual past misconduct by defendant. See *id.* at 383-84, 534 A.2d at 195 ("Given the logical relevance and substantial probative value of the evidence, and considering the court's instruction to the jury respecting the purposes for which the evidence could be considered, we cannot say that the court abused its discretion . . . .").[3]

## IV. State's Comments in Closing Argument

¶ 23. Defendant contends that several statements by the prosecutor in closing argument, highlighting the absence of any testimony that the muzzle loader described by the complainant was other than a real gun, violated defendant's Fifth Amendment right to remain silent. The prosecutor said to the jury, in reference to the photograph taken by the complainant purporting to show defendant pointing a rifle:

---

[3] That the trial court was attentive to controlling the prejudicial aspects of the State's proffers is further reflected in its rulings limiting the State's discussion of defendant's unemployment history so as to avoid introducing evidence that he sexually harassed his coworkers; redacting docket sheet entries to omit sentencing information; and excluding introduction of defendant's letters to a son excoriating his wife's supposed unfaithfulness and untruthfulness and referring to her with threatening language.

What is the explanation for that? I mean it's a fake gun. I mean keep in mind there's absolutely no evidence, whatsoever, in this case that it was anything except the muzzle loader that he owned. Any other suggestion is just a suggestion out of his mouth. It started in the voir dire during the jury selection process, a couple questions during trial, no witness in this case, all these people, these family members . . . .

At this point defendant objected on due process grounds, claiming that he had no burden of proof. The court responded by immediately instructing the jury that "[t]he defendant has no burden of proof to prove anything, as I told you at the very beginning and I'll tell you later on." The State continued:

No witness in this case, all these people who know him . . . wife, sons . . . nephew, all these people who know him, nobody says: "Oh, yeah, Wendell has got a replica gun. He's got a fake gun that looks just exactly like his musket . . . ." . . . There's just no evidence like that.

The only evidence is, he owned a gun just like this one, the one that [his son] owns . . . .

■ ■ ¶ 24. Defendant did not object on Fifth Amendment right-to-silence grounds, so we confine our analysis of this question, which was raised for the first time on appeal, for plain error. *State v. Welch*, 136 Vt. 442, 444, 394 A.2d 1115, 1116 (1978). Plain error lies only in the "rare and extraordinary cases where a glaring error occurred during trial that was so grave and serious that it strikes at the very heart of defendant's constitutional rights." *Id.* at 445, 394 A.2d at 1116. This is not such a case. First, these passages appear to be no comment on defendant's silence at all. Rather, they specifically refer to the defense's suggestion that the gun may have been fake, and the absence of any testimony to that effect by the several witnesses called by both the State and the defense. Any unlikely chance that a juror would interpret this argument as a reflection on defendant's choice not to testify was adequately addressed by the court's final instruction to the jury, which reiterated that defendant had a right to not testify and that the jury could not hold his decision in this regard against him nor consider it in its deliberations.

¶ 25. Considering defendant's timely objection on due process grounds, we are not persuaded that the argument prejudiced defendant by shifting the burden of proof from the State to defendant. The record confirms that from voir dire through opening, trial, and closing, the defense repeatedly raised the possibility that the "item" described by complainant as defendant's muzzle-loading rifle pointed at her through defendant's car window could have been a fake gun. "The burden of proving prejudice is on the respondent," State v. Lapham, 135 Vt. 393, 407, 377 A.2d 249, 257 (1977), and no undue prejudice appears here. It was not unfair for the State to point out that no witness called by the State or by defendant offered any testimony in support of the notion, introduced entirely at defendant's election, that defendant might have brandished a "fake," "imitation" or "replicate" gun. This rhetorical challenge by the State did not purport to relieve it of its burden to prove use of a real firearm — a burden acknowledged by the prosecutor's argument that the "only evidence" in the case was that the gun identified by complainant was the muzzle loader she recognized as defendant's deer rifle. Any potential confusion as to who had the burden of proof was adequately rendered harmless by the court's clarifying instruction, issued right after the objection and reiterated, as promised by the court, in its closing instructions.

¶ 26. Defendant's final argument on appeal is that the State, during its closing argument, also made impermissible comments on his failure to explain to the police, during their visit, that the gun was a fake. It is settled that the State may not comment on a suspect's post-arrest silence, State v. Percy, 149 Vt. 623, 627, 548 A.2d 408, 410 (1988), or post-Miranda warning silence, State v. Mosher, 143 Vt. 197, 202-04, 465 A.2d 261, 264-65 (1983), and we have observed that a suspect is "not required to provide an exculpatory explanation to law enforcement officers." Mosher, 143 Vt. at 204, 465 A.2d at 265. However, this does not mean it is impermissible for the prosecution to argue that a defendant's voluntary statements to police were dishonest or less than forthright. See State v. Hunt, 150 Vt. 483, 500, 555 A.2d 369, 380 (1988) ("[W]here defendant has chosen not to remain silent, the prosecutor may comment to the jury . . . [about] inferences from the statements which he made of his own volition," including "what he says or omits." (quotation omitted)). Nor is the State precluded from using a suspect's lack of explanation prior to

arrest to rebut an explanation offered by the defense at trial. See *State v. Zele,* 168 Vt. 154, 160, 716 A.2d 833, 838 (1998) (finding no Fifth Amendment violation when State raised defendant's failure to claim, during a police search, that the marijuana discovered in fact belonged to his roommate in order to rebut defense claims at trial that contraband belonged to roommate and not the defendant). Here, the defense suggested throughout the proceeding that what was depicted in the State's photographic evidence and identified by complainant as defendant's muzzle loader could be something other than an actual firearm. It was not error for the State to point out that defendant failed to offer this explanation to the police when he denied having any gun. *Id.*

*The conviction for reckless endangerment is reversed, and the conviction for aggravated domestic assault is affirmed.*