NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 118

No. 2016-244

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Justin R. Kuzawski | September Term, 2017 |

David A. Howard, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Emily Tredeau and Joshua S. O'Hara, Appellate
  Defenders, Montpelier, for Defendant-Appellant.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1.    **CARROLL, J.**  Defendant Justin Kuzawski appeals his conviction for aggravated domestic assault with a deadly weapon. He argues that there was insufficient evidence to find that he used a deadly weapon or to show that he intended to threaten the victim of his actions. We affirm.

¶ 2.    In 2015, defendant was living with his girlfriend. His girlfriend had a six-year-old daughter, E.P., from a prior relationship. E.P. lived primarily with her father, but spent one night a week at the home shared by her mother and defendant. On one of those evenings, defendant was cutting boxes with a box cutter. The box cutter defendant was using was not a typical box cutter; unlike most box cutters, the sharp blade at the cutting end of the tool was covered with a sheath of hard plastic. The blade was exposed on the sides of the tool, though this cutting edge was less than half an inch long and the plastic guard on the top extended down the sides and past the cutting

edge by approximately a centimeter. Because of the guard, the tool had a much smaller cutting edge than a typical box cutter. While defendant was using this tool to work with boxes, six-year-old E.P. approached him and asked what he was doing. Defendant initially told her "[n]othing, none of your business." E.P. persisted, and defendant then held the box cutter he was using next to E.P.'s stomach and told her that he would kill her in her sleep. He then laughed, and E.P. ran away.

¶ 3. The next day, E.P. told her father's sister about this incident. She said that she had not slept well the night before and that when she woke up she checked to make sure that another child also spending the night at the house was still alive, since E.P. herself was still alive. E.P.'s aunt contacted both E.P.'s father and the police.

¶ 4. After the police questioned defendant, the State charged him with two counts of first degree aggravated domestic assault pursuant to 13 V.S.A. § 1043(a)(2) and § 1043(a)(3). The first of these charges alleged that defendant "was armed with a deadly weapon and threatened to use the deadly weapon on a family or household member." See id. § 1043(a)(2) ("A person commits the crime of first degree aggravated domestic assault if the person . . . is armed with a deadly weapon and threatens to use the deadly weapon on a family or household member . . . ."). The second charge alleged that defendant "wilfully caused a family or household member to fear imminent serious bodily injury and has previously been convicted of aggravated domestic assault." See id. § 1043(a)(3) ("A person commits the crime of first degree aggravated domestic assault if the person . . . commits the crime of domestic assault and has been previously convicted of aggravated domestic assault."); see also id. § 1042 (providing that domestic assault occurs when person "wilfully causes a family or household member to fear imminent serious bodily injury"). The State also charged defendant with one count of cruelty to a child, alleging that he had "wilfully assaulted, ill treated, neglected or abandoned or exposed the child, or caused or procured the child to be assaulted, ill treated, neglected, abandoned or exposed, in a manner to cause the child unnecessary suffering, or to endanger the child's health." Id. § 1304.

2

¶ 5.     Following a bench trial, but before returning a verdict, the trial court noted that the State should have elected one of the two offenses charged under 13 V.S.A. § 1043. The State deferred to the court, which dismissed the charge under § 1043(a)(3). The court then found defendant guilty of first degree aggravated domestic assault pursuant to § 1043(a)(2) and not guilty of cruelty to a child pursuant to 13 V.S.A. § 1304. This appeal followed.

¶ 6.     Defendant raises two arguments related to the sufficiency of the State's evidence. First, he argues that the State did not present evidence to support the court's conclusion that the box cutter used in the incident described above was a deadly weapon. And second, he argues that the State did not present evidence to support the court's conclusion that he had the specific intent to threaten that is necessary for a conviction of first degree aggravated domestic assault. We address each of these arguments in turn.

¶ 7.     When we consider a challenge to the sufficiency of the evidence, we "must determine if the evidence, viewed in the light most favorable to the State and excluding modifying evidence, fairly and reasonably supports a finding beyond a reasonable doubt." State v. Vargas, 2009 VT 31, ¶ 18, 185 Vt. 629, 971 A.2d 665 (mem.) (quotation omitted). We review the trial court's determinations on matters of law de novo, including the court's interpretation of a statute. State v. Amsden, 2013 VT 51, ¶ 8, 194 Vt. 128, 75 A.3d 612. We review the court's findings of fact "under a clear-error standard." Id.

¶ 8.     A deadly weapon is "any firearm, or other weapon, device, instrument, material, or substance, whether animate or inanimate which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury." 13 V.S.A. § 1021(a)(3). Serious bodily injury is injury that creates "a substantial risk of death; . . . a substantial loss or impairment of the function of any bodily member or organ; . . . a substantial impairment of health; or . . . substantial disfigurement." Id. § 1021(a)(2)(A). Defendant argues that this statutory definition lists two discrete categories of deadly weapon: (1) .items specifically designed to injure, or per se deadly weapons—those objects that are designed to be used to produce death or serious

3

bodily injury, such as a loaded firearm; and (2) objects that can be called deadly weapons only if the actor actually uses them in a manner that can produce death or serious bodily injury—such as a pillow used to suffocate a victim. Defendant argues that the box cutter he held to E.P.'s stomach falls into neither of these categories. It is not an item <u>intended to be used</u> to injure because it is designed to cut boxes, and thus it is not a per se deadly weapon. Nor is it an item that, in this case, was <u>actually used</u> in a manner that could produce death or serious bodily injury because defendant held it to E.P.'s stomach, but he did not physically harm her.

¶ 9.     This reading of the statute is borne out in neither the statute's plain language nor our caselaw. When this Court considers the meaning of a statute, we begin with its plain language. <u>State v. Kimmick</u>, 2007 VT 45, ¶ 12, 181 Vt. 635, 928 A.2d 489 (mem.). If the language of the statute is clear, "we are bound to follow it." <u>Id</u>. (quotation omitted). Here, the statute provides that an object can be labelled a deadly weapon if that object "in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury." 13 V.S.A. § 1021(a)(3). Defendant's reading of § 1021(a)(3) seems to suggest that the phrase "is used or is intended to be used" modifies the list of objects included at the beginning of the provision. Thus, according to defendant's interpretation, an object is a per se deadly weapon when that object is designed or "intended to be used" to cause death or serious bodily injury. Following this reasoning, because a loaded firearm has no purpose other than to cause death or serious bodily injury, it is a per se deadly weapon and as a matter of law would satisfy the statutory definition. An object may be found to be a deadly weapon, even if it is not a per se deadly weapon "intended to be used" to cause death or serious bodily injury, if it "is used" to cause death or bodily injury. Thus, a box cutter, not specifically designed to injure but used to cut deeply enough to cause death or serious bodily injury, would be a deadly weapon because of the way it "is used," while a box cutter held to a stomach but not used to cut cannot be found a deadly weapon because its "use" causes no bodily injury.

4

¶ 10. We read the phrase "is used or is intended to be used" to modify the word "manner." That is, "any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate" falls within the statutory definition of "deadly weapon" when, during the incident giving rise to a charged offense, the object "is used or is intended to be used" in a "manner" to cause either death or serious bodily injury. See also Benson v. Muscari, 172 Vt. 1, 9, 769 A.2d 1291, 1298 (2001) (noting deadly weapons definitions are "unhelpful to defining a [probationer's deadly weapons] possession prohibition . . . because they depend upon the use or intended use of the weapon, which cannot be determined from possession alone" (emphasis added)). Whether an object is a deadly weapon is tied to the way that an object is used or is intended to be used in the commission of a crime—whether the object is a loaded firearm or a pillow. Whether an object is a deadly weapon is not tied to the object's intrinsic use or purpose—as an object intended to be used to injure or an object intended for some other purpose—but only to the way the object "is used" or "is intended to be used" in the particular incident giving rise to a charge.

¶ 11. Continuing our consideration of the statutory language, just as we ground our analysis in the plain language of a statute, we also read statutes connected "as part of one system" in concert with one another. Bd. of Trs. of Kellogg-Hubbard Library, Inc. v. Labor Relations Bd., 162 Vt. 571, 574, 649 A.2d 784, 786 (1994); see In re Preseault, 130 Vt. 343, 346, 292 A.2d 832, 834 (1972) ("Statutes in pari materia are to be construed with reference to each other as parts of one system."). Reading the definition of deadly weapons with this perspective in mind, it is clear that the two phrases, "is used" and "is intended to be used," are addressed to two distinct kinds of offenses, namely completed crimes and attempted crimes.

¶ 12. Section 1021 is the definitions section for Subchapter 4 of Chapter 19 of Title 13, which addresses disturbances of the peace. These definitions also extend to the offenses in Subchapter 6 of the same chapter and title, which addresses domestic assaults including first degree aggravated domestic assault. Several of these statutes include not just provisions penalizing a completed act, such as an assault, but also an attempt to commit an act. See, e.g., 13 V.S.A.

§ 1023(a)(3) ("A person is guilty of simple assault if he or she . . . attempts by physical menace to put another in fear of imminent serious bodily injury."); id. § 1024(a)(2) ("A person is guilty of aggravated assault if the person . . . attempts to cause . . . bodily injury to another with a deadly weapon . . . ."); id. § 1043(a)(2) ("A person commits the crime of first degree aggravated domestic assault if the person . . . attempts to use . . . a deadly weapon and threatens to use the deadly weapon on a family or household member . . . ."). The phrase "is intended to be used" in the definition of a deadly weapon is directed at the definition's applicability in these "attempt" offenses, while the phrase "is used" is directed at the definition's applicability to completed crimes.

¶ 13. Applying the statute without the "is intended to be used" clause would lead to an absurd result. Craw v. Dist. Court, 150 Vt. 114, 119, 549 A.2d 1065, 1069 (1988) ("A presumption obtains against a construction that would lead to absurd results."). Because an object is included within the category of deadly weapons when the object is used to cause death or serious bodily injury, without the alternate "intended to be used" definition, it would be impossible to prosecute an attempt to commit, for example, assault under 13 V.S.A. § 1024(a)(2) because the actor would not actually use an object in a way that could cause death or serious bodily injury but would merely attempt to use the object in such a way. Considering an object "intended to be used" to cause death or serious bodily injury a deadly weapon enables the necessary breadth to penalize an actor's intention to use an object in this way when charging an attempt offense. Defendant's reading of the statute would likewise lead to absurdity—an actor's attempt to stab a victim with a paring knife could not be prosecuted because the paring knife is meant for cutting vegetables, not people, and the actor did not actually cause harm to the victim. Thus, a deadly weapon is not just an object used in a manner that could cause death or serious bodily injury in an incident giving rise to a charged offense; it is also a weapon that the actor intended to use in an attempt to commit an offense the fulfillment of which would be a criminal act.

¶ 14. We turn now to our caselaw concerning the definition of a deadly weapon. The State need not prove that an object is actually capable of causing death or serious bodily injury in

the moment for that object to qualify as a deadly weapon within the context of a charge for first degree aggravated domestic assault under 13 V.S.A. § 1043(a)(2). State v. Longley, 2007 VT 101, ¶ 11, 182 Vt. 452, 939 A.2d 1028. There are two reasons for this rule. First, "the wording of the definition of deadly weapon is broadly written to include anything that is, in the manner used, 'known to be capable' of producing harm." Id. (quoting 13 V.S.A. § 1021(3)).[1] "[T]he statute does not require immediate dangerousness in fact. Instead, the statute focuses on the 'use' of any object and whether such use is '<u>known</u> to be <u>capable</u> of producing death or serious bodily injury.' " Id. ¶ 8 (quoting 13 V.S.A. § 1021(3)).

¶ 15. The second reason for the rule explained above relates to the charge of first degree aggravated domestic assault itself. The charge in this case, like the charge in <u>Longley</u>, alleged that defendant was armed with a deadly weapon and threatened to use the deadly weapon on a family or household member. Id. ¶ 3. This charge requires the State to prove that defendant threatened to use the deadly weapon. But it does not require an actual imminent threat—the victim need not have been in immediate danger to support a conviction for first degree aggravated domestic assault. Id. ¶ 11 ("In the context of first degree aggravated domestic assault, it is entirely irrelevant if a rifle brandished to punctuate a threat was loaded and able to fire when the threat was made, because this crime does not require an imminent threat."); cf. State v. Riley, 141 Vt. 29, 33, 442 A.2d 1297, 1298 (1982) (explaining simple assault statute "was intended to incorporate into the criminal law the civil notion of assault, that an action may be maintained against a person who places another in fear of bodily injury, even if the alleged assailant acts without purpose to carry out the threat"). Whether an object can, in the moment of the incident giving rise to a charge of first degree aggravated domestic assault, cause death or serious bodily injury is immaterial.

---

[1] Section 1021 was amended in 2016 to add introductory language and reorder the statute's subsections. Reporter's Notes—2015 (Adj. Sess.) Amendment, 13 V.S.A. § 1021. The actual language of the deadly weapons definition was unchanged, and <u>Longley</u> therefore still applies.

¶ 16. Thus, for purposes of first degree aggravated domestic assault, the statutory definition does not turn on the actor's use-in-fact within the incident giving rise to a charge. Longley, 2007 VT 101, ¶ 8. Instead, whether an object qualifies as a deadly weapon turns on the objective perception of the item's dangerousness, or whether the object is "capable of producing death or serious bodily injury." 13 V.S.A. § 1021(a)(3); Longley, 2007 VT 101, ¶ 11. And so, an inoperable firearm is a deadly weapon within the context of first degree aggravated domestic assault because finding that an object is a deadly weapon turns on "the victim's objective perception of danger based on a general knowledge that firearms are ordinarily capable of inflicting death or serious injury." Longley, 2007 VT 101, ¶ 10; see also Riley, 141 Vt. at 32, 442 A.2d at 1298 (affirming attempted assault conviction where police officer saw defendant move handgun from front seat during traffic stop and defendant argued officer in no actual danger because gun was unable to fire, and applying rule that "present ability to inflict injury upon the person assailed was [not] a prerequisite to a finding of simple assault" and "while there must be some power to do bodily harm, either actual or apparent, apparent power alone would be sufficient"); State v. Parker, 139 Vt. 179, 183, 423 A.2d 851, 853 (1980) (explaining "[i]t is the potentiality of its use to effectuate the implied threat of injury that makes any weapon dangerous" and affirming conviction for assault and robbery despite fact that defendant's gun was unloaded because "assault was accomplished by intimidation" and weapon, though unloaded, intimidated victim); State v. Deso, 110 Vt. 1, 8, 1 A.2d 710, 714 (1938) ("In the ordinary case of an aggravated assault a dangerous weapon is a weapon which in the way it is used or attempted to be used may endanger life or inflict great bodily harm." (emphasis added)).

¶ 17. This brings us squarely to defendant's argument that the box cutter involved here was not a deadly weapon. Defendant correctly points out that the tool at issue is not a typical box cutter. It has a plastic guard over its top edge, the sharp cutting edges are on the sides of the tool, and the plastic guard extends over these edges by approximately a centimeter. Thus, defendant

8

argues that because this tool has a minimal cutting edge it could not be used to cause death or serious bodily injury and, therefore, cannot fall within the statutory definition of a deadly weapon.

¶ 18.    We disagree.  The capacity of the tool to cause death or serious bodily injury at the moment of the threat is not relevant; rather, the determination of whether an object is a deadly weapon depends on an objective perception of the dangerousness of the object in question.  See Longley, 2007 VT 101, ¶¶ 10-11.  In this case, E.P. interrupted defendant while he was using the tool to cut boxes.  Objectively, then, the tool could be understood to have sharp edges and, by extension, like any other box cutter to be "capable of producing death or serious bodily injury." 13 V.S.A. § 1021(a)(3); see Dawson v. State, No. 14-01-01032-CR, 2002 WL 730757, at *2 (Tex. Ct. App. Apr. 25, 2002) (affirming jury's conclusion that box cutter was deadly weapon in conviction for aggravated assault where defendant cut victim from underarm to middle of chest with box cutter).  Because conviction for first degree aggravated domestic assault does not turn on whether a victim is in immediate danger, and an object may be found to be a deadly weapon if it is objectively capable of causing harm, we hold that the box cutter here, in this particular case, is a deadly weapon for purposes of conviction under 13 V.S.A. § 1043(a)(2).

¶ 19.    Defendant next argues the State failed to present sufficient evidence that defendant specifically intended to threaten E.P.  "[A]ggravated assault is a specific-intent crime."  State v. Bourn, 2012 VT 71, ¶ 11, 192 Vt. 270, 58 A.3d 236.  In order to satisfy this element under the charge here—that defendant threatened E.P. with a deadly weapon—"the State must show that defendant subjectively intended to threaten [E.P.] with the deadly weapon."  State v. Cahill, 2013 VT 69, ¶ 10, 194 Vt. 335, 80 A.3d 52.  "A threat is a communicated intent to inflict harm on person or property."  State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988).  But as noted above, conviction for first degree aggravated domestic assault arising from a threat with a deadly weapon does not require proof that the victim was in imminent danger.  See Longley, 2007 VT 101, ¶ 11. Thus, the factfinder need not find that a defendant actually intends to carry through on a threat;

9

rather, the factfinder need only find that a defendant meant to convey that a threat would be carried through. Cahill, 2013 VT 69, ¶ 17.

¶ 20. The State presented evidence that shortly after E.P. told her aunt that defendant threatened her, her aunt contacted the police. In response, an officer spoke with the defendant. He initially denied threatening E.P. The officer then untruthfully told defendant that he had spoken with E.P.'s mother, defendant's girlfriend, and that she had told the officer what had happened. At that point, defendant admitted holding a box cutter to E.P.'s stomach and telling her that he would kill her in her sleep. Defendant also told the officer that "[h]onestly, [he] was joking around." Defendant was then arrested, and, upon learning that the officer had not spoken with E.P.'s mother, he told the officer that he wanted to retract his earlier statement.

¶ 21. The State also presented evidence concerning a conversation between defendant and his brother following defendant's arrest. This conversation was audio and video recorded, and played during defendant's trial. During the conversation, defendant told his brother that he threatened E.P. with the "knife" because he was annoyed with her and that the police had the "knife"—"[t]he knife that I threatened to kill her with. A little box cutter. I was cutting a box with [it] and she said 'what's that?' " Defendant also told his brother that E.P. was "frightened for her life" and "that's all that matters."

¶ 22. Based on this evidence, as well as E.P.'s testimony, the trial court found that at the time of the incident defendant was "dealing with a box or some item with a box cutter." The court further found that E.P. was in some way distracting defendant while he worked. This "apparently frustrated him to some degree, and at one point [defendant] takes the box cutter and puts it towards [E.P.'s] stomach, perhaps, even making slight contact with her or, at least, holding it very close to her stomach and tells her words to the effect [of] I'm going to kill you, or, I'm going to kill you tonight while you're asleep." The court then concluded that based on the evidence, defendant intended to threaten E.P. "The evidence is that he was doing his own chores or work and was upset or bothered by E.P. asking him questions or otherwise somehow interfering with his focus,

10

and that he made the comment and gestured with the knife to scare her, to threaten her, because of that."

¶ 23. Defendant argues that he intended to make a joke and, in support, points to the fact that he laughed after threatening E.P. Defendant raised this argument in his closing argument before the trial court as well. There, he acknowledged through counsel that his actions were "a really bad idea," an inappropriate statement to a six-year-old child. Likewise, on appeal defendant states that "[h]is timing was bad, and his choice of recipient was terrible." The trial court found the argument that defendant intended his actions as a joke unpersuasive. We defer to the trial court's weighing of the evidence and credibility determinations. Benson v. Hodgdon, 2010 VT 11, ¶ 10, 187 Vt. 607, 992 A.2d 1053 (mem.) ("Our review of a trial court's finding of fact is curbed by our deference to that tribunal's unique position to assess witness credibility and the weight of evidence presented; we reverse only for clear error."). There is evidence in the record to support each of the trial court's factual findings, and those findings in turn support the court's conclusion that defendant intended to threaten E.P. There is no clear error here.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 24. **ROBINSON, J., dissenting.** The majority's conclusion does not follow from its premise. I don't take issue with the majority's legal analysis that the deadliness of an implement (or weapon) should be assessed with reference to the way it is used or threatened to be used. But even within the majority's own framework, I cannot agree that defendant threatened to use the otherwise nondeadly tool at issue here in a way that converted it to a deadly weapon. The majority's holding expands the reach of the assault-with-a-deadly-weapon statute beyond any reasonable bounds.

11

¶ 25. I agree that an implement that may not otherwise generally be viewed as a deadly weapon can be considered a deadly weapon under 13 V.S.A. §§ 1021(3) and 1043(a)(2) based on the way that it is used or threatened to be used. So, for example, a threat to smother a family member with a pillow may constitute first degree aggravated domestic assault under § 1043(a)(2) even if the actor does not carry out the threatened action. But a threat to whack someone's backside with that same pillow could not. And I agree that whether the use or threatened use of an implement is "known to be capable of producing death or serious bodily injury," § 1021(a)(3), is evaluated objectively. See ante, ¶ 16. So far, so good.

¶ 26. But I cannot fathom how this legal framework supports the conclusion that the implement at issue in this case was a deadly weapon. A picture speaks a thousand words.



¶ 27. Used in the manner threatened here, this tool is not a deadly weapon. Although the tool contains a cutting blade, the blade is protected such that it cannot actually cut anything thicker than the side of a box. In that respect, it is like a small, plastic pencil sharpener, manual can opener, or stapler. It is capable of cutting (or in the case of a stapler, puncturing) something, but is engineered so that it would be extremely difficult to use to cut (or puncture) anything other than the specific object it was designed to cut or puncture. The blade in this case faces opposite the tip of the implement. You can ram this tool into someone's abdomen, but it won't penetrate their skin.

¶ 28. The State's own description in oral argument of how this tool could be used as a deadly weapon supports my view. The State posited that, because the child in this case is small, it would be possible (perhaps while she sleeps) to slice her ear, presumably by inserting her ear

12

into the narrow channel designed for the box side.[2] Had defendant threatened to use this tool to slice the child's earlobe off in her sleep, the State might be able to make a case that he threatened to use the implement as a deadly weapon. But he didn't. He poked it into her belly—a threatened use that could not bring about the serious bodily harm that might otherwise transform this everyday household tool into a deadly weapon triggering heightened legal penalties. The threat in this case is akin to the threat to use a pillow to swat someone's backside.

¶ 29. If we are to conclude that defendant's threat to harm the child with an implement that could conceivably cause serious injury—even if unrelated to the threatened use—supports a finding that the implement is a deadly weapon, then any use or threat to a family member that involves any object would be aggravated domestic assault with a deadly weapon. A threat to hit a child's backside with a pillow would qualify because the pillow could also be used to smother the child. Poking a sibling in the back with a small plastic pencil sharpener would qualify because you could stick someone's finger in the slot and rotate the plastic casing. And threatening to poke a spouse in the belly with a manual can opener would qualify because you could close the cutting wheel on the tip of someone's finger and then turn the cutting mechanism. The majority has ignored the requirement of some connection between the actual or threatened use of an implement, and its capacity to cause serious bodily injury. In doing so, it has stretched the definition of deadly weapon in § 1021(a)(3) to cover far more behavior than I believe the Legislature intended, particularly given the dramatically higher maximum penalties imposed for the use of a deadly weapon in connection with an assault. Compare 13 V.S.A. § 1023(b) (establishing one-year prison sentence for simple assault), with id. § 1024(b) (providing for fifteen-year prison sentence for assault with a deadly weapon), and id. § 1042 (providing for eighteen-month imprisonment for

_____

[2] The State also suggested that the tool could be used to slice a child's nostril, although it is hard to imagine how the full thickness of a nostril could fit in the narrow channel and then slide down the channel the length required to actually enable the blade to contact the nostril flesh.

domestic assault), with id. § 1043(b) (establishing fifteen-year imprisonment for domestic assault with a deadly weapon).

¶ 30. The evidence in this case could support a conviction of defendant for any number of crimes. Domestic assault with a deadly weapon is not one of them. For these reasons, I dissent.

¶ 31. I am authorized to state that Justice Skoglund joins this dissent.

_____

Associate Justice