### State of Vermont v. Donald T. Forbes

[640 A.2d 13]

No. 91-450

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed November 19, 1993

Motion for Reargument Denied February 1, 1994

328

*Dan M. Davis*, Windham County State's Attorney, and *Karen R. Carroll*, Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Thomas A. Zonay* of *Carroll, George & Pratt*, Rutland, for Defendant-Appellant.

**Morse, J.** A jury convicted defendant of lewd and lascivious conduct with a child and sexual assault. See 13 V.S.A. §§ 2602, 3252(a)(3). The victim was his 11-year-old daughter. He claims the trial court abused its discretion by admitting testimony about uncharged sexual misconduct with his daughter, his history of violent outbursts in her presence and expert opinion about her physical condition, all of which impermissibly boosted her credibility. We affirm.

On November 15, 1989, defendant's daughter reported to a teacher that her father had been sexually abusing her. The child's report prompted an investigation that uncovered allegations that defendant had sexually abused her and her older sister for years. According to the daughter, defendant first initiated sexual contact with her in 1987. After the first incident, the daughter told her mother what had happened, but her mother did not believe her. Thereafter, the sexual abuse periodically recurred in the home at various times during the day and night. The daughter said that at one point she was on the verge of telling a school counselor about the abuse but her older sister persuaded her to stay silent. The older sister testified, without objection, that the victim had told her on more than one occasion that their father was sexually molesting the victim.

Defendant was charged and convicted for an incident of sexual abuse occurring on November 14, 1989. The daughter testified that while her mother was downstairs on the evening of November 14, 1989, her father came into her room and touched her vaginal area with his fingers. The child further testified that her father also tried to "stick his penis in my mouth." The mother and older sister testified that they had been at home on the night in question, but were unaware of what had occurred. The mother said defendant had slept on the couch and she did not see him go upstairs that night.

Defendant took the stand and denied that any assault ever occurred. He stated that he did not go to his daughter's room on the night in question. Rather, he fell asleep on the living room couch in front of the television and did not get up until the next morning. The defense attempted to account for the daughter's allegations by suggesting that she had fabricated the story because her father had threatened two weeks earlier to send her away to "reform school."

The State sought to refute the inference of recent fabrication by showing that fear of her father's temper had kept her from coming forward sooner. The daughter recounted that she was afraid of her father because he had shot a gun in the direction of her mother and "broke things, put holes in the walls, . . . stuck my dog's head in the wall . . . [and] almost put me through a wall . . . because I didn't finish cleaning the dining room and the living room before he got home."

## I.

■ Defendant objected without success to the evidence about the prior sexual and violent misconduct. The oft-litigated issue whether uncharged misconduct is admissible is governed by V.R.E. 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

See 22 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5239 (1978) (most frequently litigated criminal issue).

We must be vigilant in reviewing the admission of evidence of uncharged misconduct, because once jurors learn of uncharged misconduct, they tend to use an entirely "different . . . calculus of probabilities" in deciding whether to convict. See Imwinkelried, *Uncharged Misconduct*, 1986 A.B.A. Sec. Crim. J. 6, 8 (Summer) (quoting H. Kalven & H. Ziesel, *The American Jury* 179 (1966)). In fact, several empirical studies tend to confirm prosecutors' beliefs that the introduction of a defendant's uncharged misconduct can "easily tip the balance against the defendant." Imwinkelried at 8 (referring to studies conducted by the Chicago Jury Project, the London School of Economics, and the National Science Foundation Law and Social Science Project); see *State v. McCarthy*, 156 Vt. 148, 155–58, 589 A.2d 869, 873–75 (1991) (misconduct evidence can have an "incendiary" impact on the jury).

The State sought to justify admission of the sexual history and violent behavior to prove "opportunity," "intent," "motive,"

and "plan." Defendant, however, did not put any of these factors in issue. He did not argue that opportunity to abuse his daughter was lacking, for example, because he did not reside with her. Nor did defendant concede that some contact had occurred, but his intent was innocent, for example, to check and care for his daughter's hygiene. Instead, defendant categorically denied that any sexual abuse had ever occurred.

■ We need not reach the reasons cited by the State for justifying admission of the evidence of uncharged sexual abuse because, in our view, the evidence was admissible for a purpose other than those articulated by the State. The history of defendant's incestuous relationship with his daughter was particularly relevant because it supplied the context within which the charged incidents of sexual contact occurred. The point of establishing the existence of an incestuous relationship was not to make an issue of defendant's general character for sexually abusing females of minor age. Rather, the point was to establish specifically defendant's propensity to engage in sexual contact with his daughter as an object of his desire. See *Baldridge v. State*, 798 S.W.2d 127, 128 (Ark. Ct. App. 1990) (in cases of incest, character evidence is admissible under Rule 404(b) to show defendant's proclivity toward a specific act with a person with whom he has an intimate relationship).

■ Child sexual abuse is "the involvement of dependent, developmentally immature children in sexual activities that they do not fully comprehend," and incest is one form of sexual abuse usually "carried out under actual or threatened violence, or it may be nonviolent, even tender, insidious, collusive, and secretive." R. Kingman & D. Jones, *Incest and Other Forms of Sexual Abuse*, in *The Battered Child* 286 (R. Helfer & R. Kempe, eds., 4th ed. 1987); see also D. Bersharov, *Recognizing Child Abuse* 93–95 (1990) (describing family incest as pattern of behavior taking place over long period of time and which characteristically involves secrecy, denial, power imbalances, and isolation). Allegations of a single act of sexual contact between parent and child, taken out of its situational context of secrecy, oppression, and recurrence, are likely to seem incongruous and incredible.

The daughter's allegations of sexual contact on one night would have seemed incredible absent the context of a contin-

uous sexual relationship with her father. For some, any occurrence of incest is a difficult truth to grasp. See also Apel, *Custodial Parents, Child Sexual Abuse, And The Legal System: Beyond Contempt*, 38 Am. U.L. Rev. 491, 499 (1989) ("Despite the fact that an estimated twenty-two percent of Americans have been sexually abused as children, many people, including juries and judges, find it difficult to believe that it happens. . . . [I]t is even more difficult to convince them that a seemingly 'ordinary' parent is capable of, much less guilty of, sexually abusing a child."). Jurors may believe that fathers ordinarily do not molest their daughters only once and that the child must not be telling the truth without evidence of a pattern. D. Finkelhor, *Child Sexual Abuse* 93–94 (1984) ("That adults will sexually exploit a child is a disturbing fact for many people, and they often admit to having difficulty understanding why someone would do such a thing.").

■ Defendant takes the position that evidence of uncharged misconduct must be excluded unless it is offered for one of the purposes specified in V.R.E. 404(b) but no other. This "exclusionary" view is followed to some extent. See *Imwinkelried, supra*, at 9 (exclusionary approach formerly dominant in three-fifths of states and majority of federal circuits but is now increasingly disfavored). We have held, however, that the language of V.R.E. 404(b) supports admitting character evidence for purposes in addition to those delineated as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b) allows evidence of uncharged misconduct for *any purpose* other than proving the defendant's bad character. The list of admissible purposes is not exclusive, and the phrase "such as" in the rule denotes an intent that the list be considered illustrative rather than exhaustive. See *State v. Robinson*, 158 Vt. 286, 289, 611 A.2d 852, 854 (1992) (list of permissible uses under V.R.E. 404(b) is illustrative, not exclusive); *State v. Bruyette*, 158 Vt. 21, 27, 604 A.2d 1270, 1272 (1992) (evidence is admissible for "some other legitimate issue in the case").

■ Defendant also argues that a pattern of misconduct with his daughter is inadmissible because it is not relevant to proving any of the elements of lewd and lascivious conduct, which

are the commission of any lewd or lascivious act upon a child under the age of sixteen with the intent of arousing or gratifying the actor's or child's sexual desires. 13 V.S.A. § 2602. We held in a statutory rape case, however, that evidence of force was admissible even though it did not relate to any element of the crime charged. *State v. Searles*, 159 Vt. 525, 529, 621 A.2d 1281, 1284 (1993). We explained that "[a]bsent the evidence [of force], the sexual episodes would have appeared incomplete. The resulting gaps in the narrative would detract from its 'ring of truth.' Simply put, the way the sexual activity happened was relevant to the credibility of the happening." *Id.* In *Searles*, the victim's allegations of rape might have seemed incredible absent the context of force because jurors might have believed that a fifteen-year-old girl "asks for it" when she chooses to drink beer and party in an isolated spot with two men she did not know. See *id.* at 526, 621 A.2d at 1282.

The reasoning in *Searles* applies here. *Searles* involved statutory rape in a forceful context. This case involves lewd and lascivious conduct and sexual assault in an incestuous context. As in *Searles*, our holding preserves the trial court's discretion to allow the victim to tell enough of the story to preserve its integrity as a credible one. Accord *People v. Wright*, 411 N.W.2d 826, 828 (Mich. Ct. App. 1987) (sexual abuse victim's credibility is potentially undermined in eyes of jury when victim's testimony is limited to description of charged offense without reference to related misconduct). Where the crime involves incest, the history is so interwoven with the crime, it cannot be separated without skewing the event made the subject of the charge. The case depended on the daughter's credibility in describing their incestuous relationship. The credibility of the daughter's description of that relationship depended on the whole pattern of her father's conduct toward her, and not on the integrity of any particular event.

In a case like this there is less danger of the jury convicting defendant simply because it thinks he acted in conformity with his past conduct. The victim of the crime charged was also the victim of the past uncharged behavior. The daughter was either a credible victim of incest or not a victim at all. The credibility in a case like this depends on which person, victim or perpetra-

tor, is believed—not so much whether one particular incident or another is true.

The trial court also properly exercised its discretion by admitting defendant's history of violent acts in front of his daughter. The evidence of defendant's temper rebutted the inference defendant had raised on cross-examination that his daughter only recently fabricated the allegations of sexual abuse by establishing that she lived in an atmosphere where any disloyalty to her father might prompt violent retaliation. See, e.g., *State v. Cardinal*, 155 Vt. 411, 415, 584 A.2d 1152, 1155 (1990) (evidence that defendant physically attacked his seventeen-year-old daughter properly admitted to show he had "proprietary sexual interest" in her).

## II.

Defendant contends the trial court wrongfully denied his motion to preclude an expert witness from testifying for the prosecution because she vouched for the daughter's credibility.

■ The expert, a pediatric gynecologist, gave the daughter a gynecological examination shortly after the allegations of sexual abuse. The examination produced findings of abnormal nicks on the daughter's hymenal ring. The expert testified that although the nicks could have been caused by a straddle injury or a congenital defect, they were "more commonly seen in children who are sexually abused." When asked if the nicks could have been caused by fondling, the expert replied as follows:

> You know, nobody's there at the time. And when we do studies, nobody's there to see what actually happens. I don't really know what fondling is. I don't know what exactly happens when that happens. When we look at a group of children who have been sexually abused, and under the rubric fondling, we can see these kinds of findings.

At no time did the expert give an opinion as to whether the daughter actually was sexually abused, nor did the expert discuss the history the child had given her as part of the examination. In fact, the expert expressly disclaimed any intention of testifying to a conclusion about whether the daughter was sexually abused by her father:

> Q. And what do you do when you examine children in this setting; I mean, what's the purpose of your exam?

Q. And you're not an investigator?

A. The purpose of my exam is to establish what they look like physically, basically.

Q. And you're not an investigator?

A. No, child sexual abuse is not a medical diagnosis, in my estimation.

Q. And is your purpose to decide whether this child is telling the truth?

A. No.

On cross-examination by defense counsel, the expert testified:

Q. So again, there's absolutely no way that you can tell, based on the physical evidence alone, what caused it or when it was caused?

A. What I would say is in this clinical setting, you know, when I see someone who has been exposed to chicken pox and they come up with chicken pox, then I make an assumption that they are connected. And I have a history, and I have a physical exam, so I assume a causal connection, but I can't prove it. I don't know that it's the truth.

Defendant's assumption that the expert's testimony imparted an opinion that there was a causal connection between the state of the daughter's hymenal ring and the sexual abuse she claims to have experienced is not borne out in the record. At best, the expert's testimony was inconclusive. Our previous cases are replete with descriptions of the dangers of unfair prejudice which inhere in permitting expert testimony in child sexual abuse trials, see, e.g., *State v. Wetherbee*, 156 Vt. 425, 431–34, 594 A.2d 390, 393–95 (1991); *State v. Gokey*, 154 Vt. 129, 140, 574 A.2d 766, 771–72 (1990); *State v. Catsam*, 148 Vt. 366, 371, 534 A.2d 184, 188 (1987), but we are not inclined here to read into the expert's testimony that she impermissibly vouched for the daughter's credibility. See *State v. Bubar*, 146 Vt. 398, 401–02, 505 A.2d 1197, 1199 (1985).

*Affirmed.*