*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-220

JUNE TERM, 2015

| | | |
|---|---|---|
| State of Vermont | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Chittenden Unit, |
| v. | } | Criminal Division |
| | } | |
| | } | |
| Frank W. Highley | } | DOCKET NO. 3862-8-13 Cncr |

Trial Judge: Michael S. Kupersmith

In the above-entitled cause, the Clerk will enter:

Defendant appeals from his conviction of two counts of first-degree aggravated assault following a jury trial. Defendant was also convicted of being a habitual offender. He argues that the court erred by allowing the State to introduce prior bad act evidence, and failing to give the jury a limiting instruction. We affirm.

Defendant and his then-girlfriend (the complainant) were involved in a long-term, off-and-on-again relationship. They have a son who was fifteen years old at the time of the charged offenses. In August 2013, defendant was charged with three counts of first-degree aggravated assault for willfully placing his son in fear of imminent serious bodily injury, willfully causing the complainant serious bodily injury by strangling her, and recklessly causing the complainant bodily injury by pushing her into a wall causing a laceration to her head. A trial on these charges was held in mid-February 2014. The jury acquitted defendant of the strangulation count and could not reach a verdict on the two remaining counts.

The State amended the charges in late February 2014, adding the habitual offender enhancement to the remaining charges. Prior to the second trial, the State provided notice of its intent to introduce prior bad acts relating to defendant under Vermont Rule of Evidence 404(b). Defendant opposed the motion. Following a hearing, the court granted the motion in part. It explained that the State's proposed evidence fell into two categories. The first category encompassed the nature of defendant and the complainant's relationship between 1995 and 2001, including controlling activity by defendant, drug use, and emotional and physical abuse. The parties' son was born in 2001 and the parties separated at that time, largely because defendant was convicted of assaulting the complainant, resulting in his incarceration for several years. The second category of bad acts related to the parties' resumption of their relationship in 2013. The State sought to introduce testimony of both emotional and physical abuse during 2013 through the complainant, her son, and a neighbor.

The court explained that it was well-accepted that evidence of a defendant's prior conduct could be admitted in a domestic assault case "to provide the jury with an understanding of [the] defendant's actions on the date in question." State v. Sanders, 168 Vt. 60, 62 (1998). The critical factor is "to allow the victim to tell enough of the story to preserve its integrity as a credible one." State v. Forbes, 161 Vt. 327, 333 (1993). The court was also mindful that it must weigh the prejudicial effect of admissible evidence against its probative value before the evidence could be admitted at trial.

With this in mind, the court allowed limited evidence of the parties' early relationship to put the present allegations in historical perspective. It allowed the State to present testimony about the initiation of the relationship and general testimony about the dynamics of the relationship. The complainant could testify that she was assaulted during that period, but she could not go into detail unless defendant opened the door to such testimony on cross-examination or otherwise. Similarly, the State could not introduce evidence of defendant's prior convictions for domestic assault in connection with Rule 404(b) evidence unless defendant opened the door to such evidence. The court found the incidents that occurred in 2013 were virtually contemporaneous and provided more particular context to the allegations set forth in the information. The court provided the State considerable leeway in order to apprise the jury of the circumstances attending the charged incident, which occurred in late August 2013. The court allowed the State to present testimony from the complainant, her son, and the neighbor.

A jury trial was held in April 2014. The parties' neighbor testified first. She explained that she had lived downstairs from the parties for four months prior to the alleged incident. The walls were thin and she frequently heard screaming, fighting, and things being thrown around upstairs. Defendant would call his girlfriend horrible names. The complainant would scream in a way that sounded like she was being beat up. The complainant then would come downstairs after these incidents with her face and body covered in bruises. Sometimes the complainant would stay with the neighbor after these incidents. Defendant would come downstairs and apologize and say that it would not happen again, but the neighbor testified that these incidents continued to happen over and over. The neighbor never saw any injuries on defendant. On the day of the charged incident, defendant was looking for the complainant and asked the neighbor if she knew where the complainant was. When the complainant returned home later that evening, the neighbor heard defendant scream at her. She also heard things being thrown around. The neighbor left after listening to over an hour of fighting because she expected that the fighting would continue all night. The neighbor provided a statement to police the following day. During her interview with police, defendant called her looking for the complainant. He was angry that the neighbor did not know and screamed and cursed at her.

The complainant testified as well. She stated that she began dating defendant when she was fourteen and he was nineteen. The complainant was thirty-two at the time of trial. The complainant became pregnant at fourteen. While the relationship went well for a short time, defendant began to emotionally and physically abuse the complainant. He frequently abused her verbally, and choked and slapped her. The complainant had an on-and-off relationship with defendant. She had been seeing him again for about five months before the charged crimes occurred. Defendant was living with her and the parties' son. Defendant had fought with and physically abused the complainant in the months leading up to the August incident. Her son had to break up some of the fights. The complainant indicated that she had talked to her downstairs

2

neighbor about the fights. The complainant stated that she did not call the police because she did not want defendant to get into trouble.

After the charged assaults, however, the complainant did seek police assistance. She was scared for her son because defendant had threatened to "break his face." The complainant explained that the day before, she was arguing with defendant over Klonopin pills. When the complainant came home later that evening, defendant accused her of sleeping with other men. Defendant threw the complainant down and she struck her head on the corner of the wall. Defendant then got on top of her and began choking her. Her son pulled defendant off of the complainant and defendant then threatened the son. Defendant was inches from her son's face, screaming at him. The complainant thought defendant was going to attack her son. The complainant's head wound was bleeding extensively, and blood marks were evident inside and outside the apartment. She also had bruising on her body. Photographs of her injuries were admitted at trial. The parties eventually went to bed that night. Defendant told the complainant to say that she fell if she decided to go to the hospital. As indicated above, the complainant called the police on the day after the alleged assaults.

The parties' son also testified. He explained that defendant was upset on the evening in question because the complainant was not yet home. When the complainant arrived home, an argument began, which then turned physical as described above. The son explained that defendant had pushed his mother in the chest and used his feet to sweep her legs out from under her. The complainant fell and split her head open on the corner of the wall behind her. Defendant then got on top of the complainant and started choking her. The son grabbed defendant by the shoulders, pulled him off, and told him to stop. Defendant then threatened to break the son's face and break his jaw. Things then calmed down a bit and the son helped his mom wash blood out of her hair.

The police officer who responded to the complainant's call also testified. He stated that when he met with the complainant, he observed a massive laceration on the top of her scalp. He observed other injuries on the complainant as well. The complainant summarized what had occurred the night before. The officer observed a trail of blood when he went to the apartment. He talked to the complainant and her son. The complainant then went to the hospital and had staples put in her scalp. Another police officer testified as well; he described taking swabs of the blood found inside and outside the apartment. A DNA analyst testified that the blood had a very unique profile and it was unlikely to have come from anyone but the complainant.

Defendant testified on his own behalf. He stated that there had not been any fights during the time he lived with the complainant, although he said that the complainant had pushed him about a month before the charged incident and that he had called the police. He described taking Klonopin pills on the day in question. Defendant stated that when his son came home that afternoon, he smoked marijuana with him. Defendant said that he was not mad at the complainant when she arrived home later that evening. According to defendant, after fifteen minutes of conversation with the complainant, she rushed at him and began punching him in the face. Defendant did not want the complainant or himself to get hurt on a large glass coffee table so he picked up the complainant by the chest and put her in a chair. At that point, the son came out of his room and told defendant to let go of the complainant and leave her alone. Defendant was afraid of his son and he threatened to "break his [son's] face." Defendant said that he did

3

not really mean it.  According to defendant, the complainant was rocking back and forth in the chair trying to get out and attack him, and that she hit her head against the wall in the process. Defendant stated that it was "just a mishap" and that the wound was not bleeding.  He denied pushing the complainant into the corner of the wall.

Defendant's cousin also testified.  He described the parties fighting over Klonopin pills on the day of the alleged assaults.  He said that the complainant had grabbed defendant by the neck and threatened to kill him.  The cousin stated that the complainant continued to antagonize defendant when they returned to the apartment.  The jury found defendant guilty of both counts, and also convicted him of being a habitual offender.

Defendant moved for a new trial.  As relevant here, defendant asserted that "the evidence of Prior Bad Acts [sic] was extremely prejudicial and should have been excluded due to lack of proper notice."  He did not provide any further argument on this point.  The court denied the motion.  It rejected the notion that defendant had not received adequate notice of the prior bad act evidence.  The court noted that defendant appeared to claim that the prior bad acts evidence was prejudicial <u>because</u> of improper notice.  He did not allege any specific prejudice resulting from inclusion in evidence of the couple's history.  The court explained that it had considered the prejudicial effect of admitting the couple's history in a pretrial order that permitted much of the recent history and excluded certain parts.   For the reasons stated in that order, the court concluded that the prior history had been properly admitted.  The court also noted that defendant too had made significant use of this history at trial.  Defendant was sentenced to two concurrent sentences of 18-40 years to serve.  This appeal followed.

Defendant argues that the court erred in allowing the State to introduce evidence of his prior bad acts and that the court committed plain error by failing to provide a limiting instruction to the jury.  According to defendant, the prior bad act evidence was not relevant and was unfairly prejudicial.  He questions why historical perspective or the more recent alleged bad acts were necessary and asserts that there was nothing about this case that needed to be "put into context." Defendant suggests that the neighbor did not like him and that her testimony was nothing more than propensity evidence with no probative value.  Defendant maintains that it is equally unclear how the admission of the other bad act evidence was not more prejudicial than probative, particularly in light of the fact that no limiting instruction was provided.   Defendant acknowledges that he did not request a limiting instruction but asserts for the reasons above, that this Court cannot conclude beyond a reasonable doubt that defendant would have been convicted absent the prior bad act evidence.

We find these arguments without merit.  Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence that is admissible under Rule 404(b) must also satisfy the balancing test set forth in Vermont Rule of Evidence 403.  The trial court has broad discretion in making its evidentiary

rulings, and these rulings are "not subject to revision unless it clearly and affirmatively appears that the trial court withheld or abused its discretion." State v. Catsam, 148 Vt. 366, 383 (1987).

As the trial court recognized, we have allowed evidence involving a defendant's prior acts of violence against the same victim in domestic assault cases. See, e.g., Sanders, 168 Vt. at 62-63. We have found such evidence "relevant . . . to portray the history surrounding the abusive relationship, providing the needed context for the behavior in issue." Id. at 62. "The purpose of establishing [the] defendant's history of abusing the victim is not to show his general character for such abuse," we continued, "but to provide the jury with an understanding of [the] defendant's actions on the date in question." Id. As we explained:

> [a]llegations of a single act of domestic violence, taken out of its situational context, are likely to seem incongruous and incredible to a jury. Without knowing the history of the relationship between the defendant and the victim, jurors may not believe the victim was actually abused, since domestic violence is learned, controlling behavior aimed at gaining another's compliance through multiple incidents.

Id. (alteration omitted) (citations omitted). Thus, in Sanders, we found no error in the court's decision to admit evidence that the defendant had previously committed two violent acts against the victim of the charged crime.

In reaching our decision in Sanders, we cited Forbes, 161 Vt. at 331, which had applied a similar rationale to sexual abuse crimes. We held in Forbes that the trial court must be afforded discretion "to allow the victim to tell enough of the story to preserve its integrity as a credible one." Id. at 333. For certain crimes, such as incest and domestic violence, "the history is so interwoven with the crime, it cannot be separated without skewing the event made the subject of the charge." Id.

In State v. Hendricks, 173 Vt. 132, 139 (2001), we again upheld the trial court's decision to allow the State in a domestic violence case to introduce evidence of two prior incidents in which the defendant had abused the victim. We found such evidence appropriate to provide context to a domestic violence charge at issue, reiterating that "prior domestic assaults may be properly admitted to give context to a domestic violence charge because allegations of a single act of domestic violence, taken out of its situational context, are likely to seem incongruous and incredible to a jury." Id. (alteration omitted) (quotation omitted). As in Sanders, the jury in Hendricks was presented with single act of domestic violence and the defendant asserted that his actions during the incident were in self-defense, and that the injuries to the victim occurred either in defending himself or as a result of the victim's previous accidental fall. We concluded that "the introduction of two prior instances of [the] defendant's abuse of the same victim was not to show [the] defendant's propensity to commit such abuse, but rather, to provide the jury with an understanding of defendant's actions on the date in question." Id. (quotation omitted).

The trial court acted within its discretion in reaching a similar conclusion here. While defendant does not see any probative value to the evidence in question here and believes that its prejudicial effect outweighed its probative value, the court concluded otherwise. It found

general evidence about the early stage of the parties' relationship necessary to put the present allegations in historical perspective. It found the later incidents almost contemporaneous with the charged incidents and reasoned that they gave more particular context to the allegations set forth in the information. The court concluded that the probative value of this evidence outweighed its prejudicial effect.

The court's decision is consistent with our caselaw set forth above. As in prior domestic violence cases, the evidence here could help the jury put into context what might otherwise seem like a random, incongruous act, and it also could help the jury understand the complainant's actions, including her decision to remain at the apartment with defendant after the alleged assaults and her decision not to immediately contact police. The evidence also countered defendant's position that the complainant was the aggressor, that she caused her own injuries, and that the son had nothing to fear from defendant's threat to "break his face." The court did not err in finding that the probative value of this evidence outweighed its prejudicial effect. We find no abuse of discretion in the court's admission of this evidence.

We similarly find no plain error in the court's failure to sua sponte include a limiting instruction. See State v. Holcomb, 156 Vt. 251, 256 (1991) ("[T]he failure to give a limiting instruction under [Vermont Rule of Criminal Procedure] 26(c), in the absence of a request or objection, will be grounds for reversal only on a finding of plain error."). "Plain error will be found only in rare and extraordinary cases where the error is obvious and strikes at the heart of defendant's constitutional rights or results in a miscarriage of justice." Hendricks, 173 Vt. at 137 (quotation omitted). Defendant's argument appears to rest on his assertion that the prior bad act evidence was admitted in error. We have rejected that argument. He identifies no specific prejudice that he suffered from the court's failure to provide a limiting instruction, and we find none.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Marilyn S. Skoglund, Associate Justice


_____
Harold E. Eaton, Jr., Associate Justice